ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. The employer, Ameristar Casino-Vicksburg, and the carrier, Legion Insurance Company, appeal an award by the Mississippi Workers’ Compensation Commission of permanent total disability to the claimant, James Rawls. The circuit court upheld the Commission’s decision. Finding no error, we affirm the Commission’s decision.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On July 31, 2000, Rawls was injured while he was working for Ameristar Casino in Vicksburg as a slot technician, a position he had held since 1994. Rawls was fifty-eight years of age at the time of his injury and sixty years of age at the time of the workers’ compensation hearing. He dropped out of school in the tenth grade and attended an auto mechanics course at a vocational school. Later in life he earned a GED in order to obtain the position at the casino. His work history, which began at the age of sixteen, consisted of only manual labor positions. Rawls lived in Winnsboro, Louisiana and commuted about an hour each way to work. He made $756 per week as a senior slot technician. In 2000, the year that he was hurt, Rawls was recognized by Ameristar as a star employee, a company designation given to employees who do not miss any work, who do not make any mistakes, and whose work performance is good. In 1996, Rawls was the Ameristar employee of the year.
 

 ¶ 3. His job involved lifting and repairing slot machines and moving them. Rawls testified that the machines, which weigh between 150 and 300 pounds each, are bolted to stands on the floor. It takes two men to unbolt and lift the machine to move it. On the day of his injury, Rawls was beginning the process, working on his knees in front of a slot machine. He testi
 
 *677
 
 fied that before the machine could be moved, the hopper, which holds the coins and weighs between eight and ten pounds, had to be removed. He said he was bending forward to get the hopper to place it behind him when his back “popped,” extreme pain radiated up his back, and he fell over with the hopper. A co-worker had to help him to his feet because of the pain. Rawls then went to his supervisor and reported the accident. The supervisor never completed an accident report, but Ameristar became aware of the injury; two days later company personnel took him to a local hospital where he was treated and released. Rawls was given three days off work. The day after the accident, he was in pain and visited his local doctor who detected a disc protrusion and referred him to Dr. Brian Bulloch, an orthopedic surgeon, in Monroe, Louisiana. An MRI showed that Rawls had a large herniated disc at L4-5 and a disc protrusion/herniation at L5-S1 that was causing nerve compression.
 

 ¶ 4. On September 20, 2000, Dr. Bulloch performed surgery on Rawls. A fragment was removed at L4-5; parts of the disc and nerves were removed at L5-S1, and some bone and soft tissue were removed from the neural foramen to allow the nerve roots more room. During follow-up visits with Dr. Bulloch, Rawls continued to complain of pain in his back and down his right leg. The doctor gave him steroids and pain medication and recommended physical therapy after which a functional capacity evaluation (FCE) would be performed. After undergoing follow-up care and physical therapy, the FCE was done, and Dr. Bulloch gave Rawls a twenty-three percent permanent impairment rating of the spine as to his body as a whole. The FCE showed that Rawls was limited to sedentary to light duty work restrictions. The doctor said sedentary meant lifting no more than ten pounds and light duty meant lifting no more than twenty pounds and other restrictions. Dr. Bulloch testified that Rawls could not stay in one position for any amount of time because he was in a “significant amount of pain on a routine basis.” The doctor said that it would be hard for Rawls to make the commute every day with his restrictions. Rawls was prescribed Darvocet, which he was to take every four to six hours for pain. He testified, however, that he was only able to take one Darvocet at bedtime because taking the medication made him “not think straight.” Rawls testified that he could not work and take the pain medication.
 

 ¶ 5. The risk manager for Ameristar, Leesha Heard, testified that the casino offered Rawls a job after he was released by Dr. Bulloch. The job offer was for a position of transportation dispatcher. Heard described the duties of the job as talking on a radio to dispatch shuttles to pick up guests and take them from the casino to the hotel or some other location. Heard said Rawls would have made the same pay and that the duties of the job would allow him to sit and stand as needed and involved no heavy lifting. All the employee would have to do, according to Heard, was to push a button and talk into microphone or use a telephone. Rawls testified that he made no effort to accept the transportation dispatcher job because he realized that with the restrictions on his health he would be unable to perform the duties. Rawls testified that when he drove to Vicksburg from his home in Winnsboro he had to pull over, stop, and get out of his car twice to move around in order to continue the trip. He said when he reached Vicksburg he could not get out of his truck, but after twisting his legs for a time, he was later able to get out. Rawls said he realized from that trip that “this is not going to work,” meaning he was not going
 
 *678
 
 to be able to drive to work from his hometown in Louisiana and then be able to perform any job. He said, instead of checking on the dispatcher job, he went to see about his 401(k) account. He testified that he knew there was “no use” to check on the dispatcher job because “he wouldn’t be able to do anything” after the drive from his home and because there was no physical position he could be in that was comfortable enough so that he could work.
 

 ¶ 6. Dr. Bulloch testified that during follow-up visits, Rawls continued to complain of pain in his back and right leg; Dr. Bullock suggested a pain management consultation because Rawls was not a candidate for further surgery. The doctor was asked if he thought that Rawls was a candidate for employment, and he replied, “I think that positions would be few and far between. He was not employable in most situations.” The doctor explained that because Rawls was limited in his ability to sit or stand in any position for a significant length of time, probably about fifteen to twenty minutes, and because he was in extreme pain most of the time and taking medication, there were “very few positions that are available for employment for someone in that situation.”
 

 ¶ 7. When the case arrived at the Commission for a decision, the parties had stipulated that Rawls suffered a compensa-ble injury on July 31, 2000; that Rawls’s average weekly wage at the time of the accident was $756; that the employer, Am-eristar, and the carrier, Legion Insurance, paid Rawls temporary total disability benefits in the amount of $10,573.92 from August 16, 2000, through April 11, 2001, at the rate of $303.35 per week; and that all temporary total disability benefits had been paid by the employer and carrier.
 

 ¶ 8. The only issue before the Administrative Law Judge (ALJ) was the existence/extent of permanent disability and/or loss of wage-earning capacity, if any of Rawls.
 

 ¶ 9. At a March 23, 2003, hearing the ALJ received testimony from Rawls and his wife; Ameristar only offered the testimony of Heard, a corporate risk manager for Ameristar. Already in the record were the deposition of Dr. Bulloch, Rawls’s primary treating physician, and supporting medical documentation. Also placed in the record by Ameristar was a March 6, 2002, deposition of Rawls.
 

 ¶ 10. The ALJ issued an opinion on August 22, 2003, setting out the testimony of lay and medical witnesses. Also, the ALJ noted that shortly before the hearing, Dr. Bulloch referred Rawls to a pain management clinic in Louisiana for lumbar transforaminal steroid injections on the right L5-S1 level. The ALJ found the treatment reasonable and necessary and ordered Ameristar to pay for this treatment.
 

 ¶ 11. Further, the ALJ ordered that Rawls be referred to Dr. Rahul Vohra for an independent medical examination. The ALJ said she was doing this “out of an abundance of caution to protect the rights of the claimant.”
 

 ¶ 12. Dr. Vohra, a Jackson physiatrist or physician who specializes in physical medicine and rehabilitation, ran a series of tests on Rawls including EMG/nerve conduction studies, lumbar myelogram, post myelogram CT, lumbar spine flexion, and extension and hip x-rays. After those tests were completed, a functional capacity evaluation (FCE) was done. Dr. Vohra determined that Rawls would not benefit from further surgery. Dr. Vohra testified that the FCE placed Rawls at a light duty level of work with occasional light lifting, carrying fifteen pounds, pushing forty pounds, and pulling ten pounds occasionally. Dr. Vohra testified that Rawls could
 
 *679
 
 stand for an hour at a time, change positions, sit for at least five or ten minutes, maybe up to an hour, and could squat, bend or stoop occasionally up to a third of the day. Dr. Vohra said that Rawls could climb stairs occasionally. Dr. Vohra was of the opinion that continued management of Rawls’s pain with narcotic pain medications was reasonable. Dr. Vohra assessed a permanent disability rating of ten percent to the whole body.
 

 ¶ 13. Ameristar presented evidence that it had offered Rawls the transportation dispatcher job which it claimed would meet the restrictions placed upon him by the doctors, would pay him at the same rate as he earned while employed as a slot technician, and required no special skills or training to perform. Rawls testified that he never made an effort to accept the job. Further, Rawls testified that he made no real job search after the injury except asking a couple of friends that have stores if they would let him work there, which they would not.
 

 ¶ 14. The ALJ in her second opinion found that Rawls was permanently and totally disabled as a result of the July 31, 2000, work-related accident. Based on the testimony of both Drs. Bulloch and Vohra, the ALJ found that Rawls’s work ability was limited to light duty, and she further found that both doctors agreed that no further surgery would be helpful and that pain management with narcotic medications was the long-term prognosis for Rawls. The ALJ ordered the employer/carrier to pay permanent total disability benefits of $303.25 per week beginning on July 31, 2000. The order allowed the employer/carrier to receive credit for any payments of compensation of benefits or compensation already paid and ordered that the employer/earrier pay Rawls’s future reasonable and necessary medical bills.
 

 ¶ 15. Ameristar appealed to the Commission, which took no further evidence and affirmed the decision of the ALJ. Am-eristar further appealed to the Circuit Court of Warren County, which affirmed the decision of the Commission. Ameris-tar now appeals the judgment of the circuit court.
 

 STANDARD OF REVIEW
 

 ¶ 16. A decision of the Workers’ Compensation Commission is subject to a limited standard of appellate review.
 
 Weatherspoon v. Croft Metals, Inc.,
 
 853 So.2d 776, 778(¶ 6) (Miss.2003). The Commission is the ultimate fact-finder, and this Court will reverse its judgment only if the judgment lacked the support of substantial evidence, was arbitrary and capricious, or contained an error of law.
 
 Id.
 
 When, as here, the Commission accepts the ALJ’s findings and conclusions, we review those findings and conclusions as those of the Commission.
 
 McDowell v. Smith,
 
 856 So.2d 581, 585(¶ 10) (Miss.Ct.App.2003). Additionally, “when examining conflicting opinions by medical experts, ‘we will not determine where the preponderance of the evidence lies ... the assumption being that the Commission as trier of fact, has previously determined which evidence is credible, has weight, and which is not.’ ”
 
 Hardaway Co. v. Bradley,
 
 887 So.2d 793, 796(¶ 12) (Miss.2004) (quoting
 
 Baugh v. Cent. Miss. Planning and Dev. Dist.,
 
 740 So.2d 342, 344(¶ 8) (Miss.Ct.App.1999)).
 

 ¶ 17. Before we begin our analysis, we must discuss the opinion of the circuit court in this case. The circuit court wrote an opinion in which it affirmed the decision of the Commission after finding there was substantial evidence to support the Commission’s finding that Rawls was permanently totally disabled. The circuit court then ventured into a discussion of the issue that Ameristar raised about certain state
 
 *680
 
 ments made in the ALJ’s opinion regarding Rawls’s employability and concerning whether Rawls’s continued use of pain medication should be taken into consideration in determining permanent total disability. Considering the issue as a case of first impression, the circuit court cited cases from two states and a body of federal law under ERISA, finding that the continued use of narcotic pain medications is a proper factor for the Commission to consider in making a determination of disability. We note that proeedurally the appeal from the circuit court’s review of the Commission’s decision is a final judgment of the circuit court.
 
 Delta CMI v.
 
 Speck, 586 So.2d 768, 772-73 (Miss.1991). However, our review for all practical purposes is a review of the Commission’s order, not that of the circuit court.
 
 Id.
 
 at 773. As we said in
 
 Posey v. United Methodist Senior Servs.,
 
 773 So.2d 976, 978(¶5) (Miss.Ct.App.2000), “[o]ur task is to review the Commission’s decision for validity, even though the appeal is technically from the circuit court.” This review of the Commission’s decision was explained by one noted treatise as follows:
 

 In cases where the standard of review requires deference or where the question is whether there has been an abuse of discretion, the appellate court looks to the decision at the commission level and not to the circuit court. While as a practical matter the appellate court may consider and gain insight from the action of the circuit court, particularly where that court has filed a written opinion explaining its decision, it is clear that the appellate court owes no deference to the decision of the circuit court.
 

 John R. Bradley and Linda R. Thompson, Mississippi Worker’s Compensation § 8:6 (Thomson-West 2006).
 

 ANALYSIS
 

 ¶ 18. Ameristar and Legion Insurance, which we will refer to collectively as Amer-istar, raise ten issues on appeal. However, due to the repetitive nature of the errors we will summarize them as discussed below.
 

 I. WAS THE OPINION OF THE ADMINISTRATIVE LAW JUDGE AS AFFIRMED BY THE COMMISSION AND CIRCUIT COURT, AWARDING RAWLS PERMANENT TOTAL DISABILITY BENEFITS, BASED UPON SUBSTANTIAL EVIDENCE?
 

 ¶ 19. Ameristar bases this error: (1) upon Rawls’s “failure to undertake reasonable efforts to gain employment in similar or other vocations after reaching maximum medical improvement,” (2) upon his failure to accept the job offer from Ameris-tar that it said met the work restrictions of his treating physicians, and upon a lack of substantial evidence to support the Commission’s findings.
 

 ¶ 20. “ ‘Disability’ means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss.Code Ann. § 71-3-3(1) (Rev. 2000). The supreme court has said that the concept of disability comprises a physical injury coupled with a loss of wage-earning capacity.
 
 I. Taitel & Son v. Twiner,
 
 247 Miss. 785, 792, 157 So.2d 44, 46 (1963). Further, disability is determined by comparing the employee’s pre-injury wages with the employee’s post-injury capacity to earn wages in the open labor market.
 
 Karr v. Armstrong Tire & Rubber Co.,
 
 216 Miss. 132, 137-38, 61 So.2d 789, 792 (1953). We find that Rawls’s wage-earning capacity after his injury was
 
 *681
 
 essentially zero; thus, he is totally disabled. Both the medical testimony and Rawls’s testimony support this conclusion.
 

 ¶21. The record shows that Rawls’s treating physician, Dr. Bulloch, when questioned about Rawls’s employability testified that due to his injury, he was not employable for most situations. Specifically, the record shows the following testimony from Dr. Bulloch about Rawls’s employ-ability:
 

 [ATTORNEY FOR RAWLS]: Did you think he was employable at that point, doctor?
 

 [DR. BULLOCH]: Certainly, there is a possibility they could have found a position that he would be able to work at, but I think that position would be few and far between. He was not employable in most situations.
 

 [Attorney for Ameristar objects to the form of the question and Rawls’s attorney restates the question.]
 

 [ATTORNEY FOR RAWLS]: Let me see if I can phrase it in an acceptable manner. Doctor, did you, based upon your history and treatment of the patient, did you have an opinion as to his employability at that point in time?
 

 [DR. BULLOCH]: Yes.... Reviewing his current situation, he was in significant pain on a routine basis that limited his ability to sit or stand in any position for a significant length of time. Probably fifteen to twenty minutes was about as much as you can ask him to stay in one position. And in someone who is constantly in a large amount of pain, can’t stay in one position, can’t lift a significant amount of weight, there are very few positions that are available for employment for someone in that situation.
 

 ¶22. Further, Rawls testified, unchallenged, about his abilities as a result of the injury. He said that he could sit only for a period of fifteen minutes without discomfort, which means that he must “get up and walk, move around, go back and sit down.” When asked if there were any positions that he could get comfortable in, Rawls said that there was not, “not even laying [sic] down.” He said he could only lift about ten pounds if the object was on a table and not on the floor, and he could no longer climb a ladder. Rawls also testified regarding his inability to commute the hour’s drive to Vicksburg. He said that on his first trip to Vicksburg after the injury, he had to stop the truck twice and get out and move around for a timé because of the discomfort, and when he reached Ameris-tar, he was unable to get out of the truck and had to twist his legs for a time to be able to get out. Rawls testified that he was in constant pain for the whole trip. He testified that he had been prescribed the pain medication Darvocet to take every four to six hours, but after a month, he had to cut the dosage to one tablet at bedtime because he could not think straight on the medication. His attorney asked him if he could work while taking pain medication, and Rawls said that he could not because “it messes up my ability to do anything” and because of the company’s drug policy.
 

 ¶ 23. Dr. Vohra’s testimony was that Rawls could do light duty work, which would allow him to sit and stand for an hour at a time then change positions, to do some bending and stooping, and to do some lifting of no more than twenty pounds. Dr. Vohra also testified that Rawls would remain required to be on medication for his pain as no further surgery was indicated.
 

 ¶ 24. The burden of proof of the degree of disability whether it is permanent or temporary, as well as the extent of the disability, is upon the claimant.
 
 *682
 

 Am. Potash & Chem. Corp. v. Rea,
 
 228 So.2d 867, 868 (Miss.1969). While medical evidence must support the claimant’s incapacity and its extent thereof, the proof of disability need not be proven entirely by medical evidence “as long as there is medical testimony which
 
 will support
 
 a finding of disability.”
 
 Hall of Miss., Inc. v. Green,
 
 467 So.2d 935, 938 (Miss.1985). An injured employee establishes a prima facie case of disability by showing that, because of the work-related injury, he cannot secure work in the same or other jobs at pre-injury rate of pay.
 
 Ga. Pac. Corp. v. Taplin,
 
 586 So.2d 823, 828 (Miss.1991). Once the claimant has made out a prima facie case, the employer has the burden to prove otherwise by showing that the claimant’s efforts constituted mere shams or unreasonable efforts.
 
 Id.
 
 An evaluation of the reasonableness of the claimant’s job search may include consideration of job availability and the economics in the local community, the claimant’s general education and work skills, and the nature of the disability itself.
 
 Piper Inds., Inc. v. Herod,
 
 560 So.2d 732, 735 (Miss.1990). “Factors which this Court has considered in determining loss of wage-earning capacity include the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances.”
 
 Univ. of Miss. Med. Ctr. v. Smith,
 
 909 So.2d 1209, 1220(¶39) (Miss.Ct.App.2005) (quoting
 
 McGowan v. Orleans Furniture Inc.,
 
 586 So.2d 163, 167 (Miss.1991)).
 

 ¶ 25. We find that Rawls’s medical evidence, as well as his own testimony, met his burden of proof by making out a prima facie case of work-related disability. His proof showed that because of the injury, and the resulting physical restrictions it caused, he is unable to work in any employment. Both the medical proof and Rawls’s testimony were to the effect that as a result of the injury Rawls suffered severe permanent physical limitations. Thus, the burden shifted to Ameristar to show that Rawls’s efforts to find work constituted mere shams or unreasonable efforts. On this issue Ameristar offered the testimony of only one witness, Heard, the risk manager for Ameristar, who testified about a transportation dispatcher job that Ameristar had for Rawls. Rawls testified that he did not pursue the job for the following reasons: he was unable to make the hour-long commute from his home in Louisiana because of the pain from his injury; he would not have been able to take pain medication and work at Ameris-tar because the medication made him “not think straight” and the pain medication, Darvocet, might make him unable to pass Ameristar’s employee drug policy.
 

 ¶ 26. We can find that Rawls’s job search, which was really no more than a rejection of the one job offered by Ameris-tar, was reasonable under the facts of the case. The record shows that Rawls’s long career in hard manual labor has been ended by his unfortunate injury at Ameristar. He was a star employee of Ameristar in 2000, the year of his injury. Further, he was Ameristar’s employee of the year in 1996. Any attempt by Ameristar to depict him as a slacker for not taking the dispatcher job is unfounded. Instead, the record shows that prior to the disabling on-the-job accident Rawls was a capable and reliable worker. When determining Rawls’s wage-earning capacity, we note that Rawls was sixty years old at the time of the Commission’s hearing, and he will be sixty-six years old this year. His education is limited to a high school education earned by GED, and his work career has been spent in manual labor jobs. (To his credit, Rawls earned the GED in order to work at Ameristar.). His injury and the accompanying extreme pain as shown by
 
 *683
 
 the medical proof and his testimony have demonstrated that Rawls’s ability to work has been severely limited, if not completely ended. Thus, we hold that the Commission’s finding that Rawls was entitled to permanent total disability benefits was correct; this assignment of error is without merit.
 

 II. DID THE COMMISSION ERR AS A MATTER OF LAW IN ADOPTING THE ADMINISTRATIVE LAW JUDGE’S FINDING THAT “COMMON SENSE TELLS ONE” THAT RAWLS WAS UNEMPLOYABLE BASED UPON THE PAIN MEDICATION?
 

 ¶ 27. Ameristar makes a mighty attack upon the ALJ’s opinion for her statement that “common sense tells one that no employer will hire someone who is taking narcotic pain medication coupled with muscle relaxers and membrane stabilizers” and the statement that “it is the opinion of the undersigned that Mr. Rawls simply cannot function in the workforce while taking these types of medications.” Ameris-tar argues that these two statements are unsupportable conclusions which are errors as a matter of law.
 

 ¶ 28. When the ALJ’s opinion is analyzed in conjunction with the record medical and lay testimony, we find that these statements of the ALJ, concerning the em-ployability of persons on pain medications, were merely in the nature of dicta and not necessary for the determination of the opinion. Dicta has been defined as expressions in a court’s opinion “which go beyond the facts before [the] court and therefore are [the] individual views of [the] author of [the] opinion and [are] not binding in subsequent cases as legal precedent.” Black’s Law Dictionary 454 (6th ed.1990).
 

 ¶ 29. We have found supra in Issue I, that the record supports the Commission’s finding of permanent total disability. We find that the Commission could make such a determination without consideration of the two challenged statements of the ALJ. Therefore, we find that this issue is without merit.
 

 ¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.