ISHEE, J.,
 

 for the Court:
 

 ¶ 1. After the administrative law judge (ALJ) entered an order finding that Taki-sha Stephenson had reached maximum medical improvement and was due no benefits, she appealed to the Workers’ Compensation Commission (the Commission). The Commission reversed, finding that benefits were wrongfully denied. International Staff Management and Legion Insurance Company (International),
 
 [1]
 
 her employers, appealed the adverse finding to the Circuit Court of DeSoto County, which affirmed the Commission’s decision. In
 
 *369
 
 ternational appeals from that judgment and asserts two issues:
 

 I. Stephenson’s injuries from the shooting were not within the course and scope of her employment, and
 

 II. The Commission’s findings regarding Stephenson’s permanent disability as a result of the shooting are not supported by substantial evidence and are based on an error of law.
 

 Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On June 28, 2000, after her shift at One Source,
 
 [2]
 
 in Olive Branch, Mississippi, Stephenson was leaving work when she was approached by Terry Crane, who was not an employee.
 
 [3]
 
 Crane told Stephenson that she was wanted inside, so she followed him back in the building. Upon entering, she discovered Reginald Davis, a former co-worker, armed with a handgun and holding her co-workers hostage. Davis shot Stephenson in the back of the head and shot Crane in the shoulder; then Davis turned the gun on himself and committed suicide.
 

 ¶ 3. Stephenson handled quality assurance, and she oversaw one of One Source’s three assembly lines. Davis began working at One Source in December 2000, and he worked on Stephenson’s assembly line. Stephenson had previously experienced problems with Davis, who she believed had a crush on her and had tried to flirt with her at work. At some point, Davis had stolen some of Stephenson’s pictures from her desk.
 

 ¶ 4. On June 20, 2000, Davis got into an argument with Mildred Mack, one of the managers at One Source. After Davis began cursing Mack, she went to the office and brought back termination papers that she and Shawn Mullaly
 
 [4]
 
 had signed. They told Stephenson that she needed to sign the papers as a witness, but she never signed anything. Davis was some distance away when they asked Stephenson to sign, but it was unclear whether he heard the conversation. Davis’s employment was terminated that day. Later that day, Stephenson discovered that someone had keyed or scratched her husband’s car, which she had driven to work. She and her husband, Terry Stephenson (Terry), called the police regarding the incident, and they filled out a police report.
 

 ¶ 5. On June 26, 2000, Stephenson was notified by a secretary at One Source that she had a phone call from her husband. When Stephenson picked up the phone, she discovered that it was not her husband; it was Davis. Davis said he was going to kill Stephenson. He gave Stephenson his phone number, and he said that if she did not call him, he would kill her husband and her children. Either Stephenson or someone else at One Source contacted the police regarding the incident.
 

 ¶ 6. The following day, Stephenson spotted Davis staring at her after she dropped her kids off at daycare. She returned home to tell her husband, and they went to the Byhalia Police Department to complain about Davis, who the Stephensons alleged had been harassing them. Officer Jason Hughey talked with the couple about the
 
 *370
 
 incident. He then went to the bus stop in Byhalia where Davis was to question him about the incident. Although Officer Hu-ghey told Stephenson and her husband to remain at the police station, they also went to the bus stop. At the bus stop and in the presence of Officer Hughey, Davis again threatened to kill Stephenson, and he said that he had stolen pictures off of her desk.
 

 ¶ 7. On June 28, 2000, the morning of the shooting, Terry was dropping his children off at daycare when he again encountered Davis. He noticed Davis staring at him, and Davis approached him and said he needed to tell Terry something. Terry responded that he did not want to talk to Davis. When Davis noticed someone else approaching, he ran away. The police were called regarding the incident, and Officer Hughey apprehended Davis and transported Davis back to the daycare. At that point, Davis began telling Terry that he was having an affair with Stephenson. The police released Davis from custody, and it was that afternoon that he returned to One Source and shot Stephenson.
 

 ¶ 8. As Stephenson was leaving for the day, Crane approached her and asked her to come back inside to speak to the manager. Stephenson, believing that something was wrong with the paperwork that she had filed, went back inside the building and into the office. Jackie Cook testified in her deposition that she entered the office that afternoon, and Davis pointed a gun at her. He said he was there for Stephenson. Cook had heard that Stephenson had fired Davis, and she thought that was the reason Davis was after her. Cook admitted that she had also heard that it was Mack who had fired Davis. As far as Cook knew, Stephenson and Davis only had a working relationship; she had never heard any rumors about an affair between them. Cook did not recall any problems between Stephenson and Davis besides the confrontation at the daycare. Also, Mack, who actually signed Davis’s termination papers, had not heard that Stephenson and Davis were having an affair, and the only problem she had heard about was the daycare incident.
 

 ¶ 9. On August 8, 2000, Stephenson filed a petition to controvert alleging that she had suffered a work related injury when she was shot by Davis on June 28 and as a result, was she was permanently and totally disabled. International filed an answer admitting that the incident occurred, but it denied that Stephenson was permanently disabled as a result of the incident or that she suffered a loss of wage earning capacity as a result of her injury.
 

 ¶ 10. In November 2000, Stephenson was released to return to work by Dr. John Brophy, a neurosurgeon and Stephenson’s treating physician for her gunshot injuries.
 

 ¶ 11. The ALJ entered an order in April 2002 finding that the injuries Stephenson received when she was shot by Davis, were suffered in the course and scope of her employment. The ALJ ordered that Stephenson be paid temporary total disability benefits beginning on June 28, 2000 and continuing through November 27, 2000. The ALJ also ordered that Stephenson undergo an independent medical examination by Dr. Keith Atkins, a clinical neuropsychologist. The ALJ’s decision was affirmed by the full commission.
 

 ¶ 12. Stephenson underwent an examination by Dr. Atkins. Dr. Atkins was offered as an expert in the field of clinical neuropsychology. He examined Stephenson on June 5 and 19, 2002. Based on his review of Stephenson’s medical records, Dr. Atkins described how the bullet caused injuries to the cerebellum and the lower occipital lobe in her brain. Dr. Atkins testified that the cerebellum controls coor
 
 *371
 
 dination of fine motor control and movements and the occipital lobe, which is the vision center of the brain. Dr. Atkins detailed various tests that he gave Stephenson to test her effort and symptom exaggeration. Based on the results of the tests, he concluded that Stephenson was not giving her best effort on the exams and was probably exaggerating her symptoms. Dr. Atkins reasoned that: “[S]uch widespread poor effort and symptom exaggeration invalidates the remainder of [Stephenson’s] neuropsychological profile. In other words, I have no confidence in the validity of her neuropsychological scores, most of which fell within the impaired range.” Dr. Atkins found no reason why she would not be able to return to the workplace.
 

 ¶ 18. Stephenson was also examined by Dr. Martha Nan Hawkes. Dr. Hawkes, a neuropsychologist, testified at the hearing as an expert in neuropsychology and clinical psychology. Over two days, on January 13 and 14, 2003, Dr. Hawkes performed a neuropsychological evaluation of Stephenson, consisting of several tests, to examine her brain function or cognitive function or thinking. According to Dr. Hawkes, Stephenson’s motivation tests were valid. The tests indicated that she was not exaggerating her symptoms; she was not faking or malingering. Incidents in Stephenson’s patient history included the following: memory problems, poor concentration, personality changes, slurred speech, confusion, hearing difficulty in her right ear, and chronic cough. At the time Dr. Hawkes examined Stephenson, it had been three years since the shooting, and Dr. Hawkes found that Stephenson had reached maximum medical improvement approximately eighteen to twenty-four months after the injury. Dr. Hawkes concluded that Stephenson had suffered moderate brain damage from the gunshot and that Stephenson could not be gainfully employed due to memory and cognitive problems.
 

 ¶ 14. The Commission asked Dr. Atkins to reevaluate Stephenson in light of Dr. Hawkes’s findings, but he refused. He reasoned that his initial critical evaluation of Stephenson compromised his ability to evaluate her further. It was his belief that, in light of his critical report, Stephenson would not cooperate with him, and he would not be able to establish a working rapport with her.
 

 ¶ 15. The Commission remanded the case with instructions that the ALJ admit the testimony of Dr. Hawkes. After considering Dr. Hawkes’s testimony, the ALJ found that Stephenson had reached maximum medical improvement on November 27, 2000, and had no permanent impairment or loss of wage-earning capacity. The ALJ based his findings on the fact that Dr. John Brophy released Stephenson to return to work and on Dr. Atkins’s testimony that Stephenson exaggerated her symptoms. Stephenson appealed the ALJ’s ruling to the Commission. The Commission reversed the opinion of the ALJ, finding that Dr. Hawkes performed a thorough evaluation of Stephenson and that Dr. Atkins’s testimony did not discredit that evaluation. The Commission noted that it was unclear how Dr. Atkins could opine that Stephenson could return to work, when he had no confidence in the validity of the results of her neuropsycho-logical exams and found Dr. Hawkes’s results to be flawed.
 

 STANDARD OF REVIEW
 

 ¶ 16. This Court applies a limited standard when reviewing a decision of the Commission.
 
 Ameristar Casino-Vicksburg v. Rawls,
 
 2 So.3d 675, 679 (¶ 16) (Miss.Ct.App.2008) (citation omitted). As the Commission is the ultimate fact-finder,
 
 *372
 
 we will only reverse its decision if it was not supported by substantial evidence, was arbitrary and capricious, or if the judgment contained an error of law.
 
 Id.
 

 DISCUSSION
 

 I. Compensability
 

 ¶ 17. First, International takes issue with the Commission’s finding that Stephenson’s injuries from the shooting were compensable injuries. Its position is that Davis’s motives for shooting Stephenson were purely personal, having to do with an alleged relationship between the two. International concludes that, because Davis’s motives were personal, they were wholly unconnected from Stephenson’s employment; therefore, her injury is not compensable.
 

 ¶ 18. An order from the Commission must be final before it is appealable.
 
 Flexible Flyer, Inc. v. Harris, 755
 
 So.2d 50, 51 (¶ 7) (Miss.Ct.App.2000) (citing
 
 Bickham v. Dep’t of Mental Health,
 
 592 So.2d 96, 97 (Miss.1991)). Here, International appealed the ALJ’s determination of compensability to the Commission, and the Commission affirmed the ALJ’s opinion and remanded the claim for a determination of benefits. At that time, it was not proper for International to have appealed the determination of compensability because the proceedings were ongoing.
 

 ¶ 19. Mississippi Code Annotated section 71-3-7 (Rev.2000) provides as follows: “Compensation shall be payable for disability or death of an employee from injury or occupational disease arising out of and in the course of employment, without regard to fault as to the cause of the injury or occupational disease.” “Injury” includes both an accidental injury and “an injury caused by the willful act of a third person directed against an employee because of his employment while so employed and working on the job....” Miss. Code Ann. § 71-3-3 (Rev.2000). This Court has stated the following regarding the compensability of an intentional act that causes an injury:
 

 When the assault is unconnected with the employment, or is for reasons personal to the assailant and the one assaulted, or is not because the relation of the employer and employee exists, and employment is not the cause, though it may be the occasion of the wrongful act, and may give a convenient opportunity for its wrongful act, it is ordinarily held that the injury does not arise out of the employment.
 

 Hawkins v. Treasure Bay Hotel & Casino,
 
 813 So.2d 757, 760-61 (¶ 16) (Miss.Ct.App. 2001) (quoting
 
 Brookhaven Steam Laundry v. Watts,
 
 214 Miss. 569, 626, 636, 59 So.2d 294, 300 (1952)). The determination of whether a third party’s intentional tort against an employee is compensable is a factual determination for the Commission.
 
 Total Transp., Inc. of Miss. v. Shores,
 
 968 So.2d 400, 406 (¶21) (Miss.2007) (citing
 
 Barry v. Sanders,
 
 211 Miss. 656, 661, 52 So.2d 493, 495 (1951)).
 

 ¶ 20. International alleges that the facts show that Stephenson was not involved in Davis’s termination and that Davis was romantically obsessed with Stephenson. Notably, Davis only harassed and threatened Stephenson, and she admitted that Davis tried to flirt with her and had a crush on her. International also points out that Davis never mentioned his firing and that it was unclear whether Davis even knew that Stephenson was asked to sign his termination papers. Aside from being asked to sign the papers, which Stephenson did not do, she had no part in Davis’s termination.
 

 ¶ 21. However, none of Stephenson’s coworkers suspected any romantic involvement between her and Davis, and Stephen
 
 *373
 
 son denied that they had been having an affair. Furthermore, a rumor circulating around One Source was that Stephenson was the one who fired Davis. Cook testified that she heard the rumor from Davis’s friend, Dewayne Pitts, who was a temporary worker at One Source. Davis only shot at Stephenson, but he told everyone else that entered the office that he or she had “bought it too.” Aside from Davis’s threats and allegations of an affair, with which the ALJ found little credibility, there was little to support a finding that he and Stephenson were having an affair.
 

 ¶22. Ultimately, the ALJ found the case to be doubtful as to whether the existence of any real or imagined relationship between Davis and Stephenson was the sole cause of her injuries. To “fulfill the beneficent purposes of the statute,” the rule is that doubtful claims must be resolved in favor of compensation.
 
 Duke ex rel. Duke v. Parker Hannifin Corp.,
 
 925 So.2d 893, 897-98 (¶ 15) (Miss.Ct.App.2005) (citing
 
 Marshall Durbin Cos. v. Warren,
 
 633 So.2d 1006, 1010 (Miss.1994)). Therefore, the ALJ found that it was proper to resolve the claim in Stephenson’s favor. The Commission signaled its agreement with the ALJ’s finding by adopting his ruling. There was certainly some evidence to support a finding that the shooting was personally motivated. However, we afford the Commission discretion when reviewing its findings, and we find the ruling, that Stephenson’s claim was compensable, was supported by substantial evidence. All of the testimony reveals that until the day Davis was fired, he was an agreeable employee, and he did not have any arguments with his coworkers. It was not until after he was fired that he appeared to target and eventually shoot Stephenson. Furthermore, when Stephenson returned to the office and was shot, she was responding to what she believed was a request from her supervisor.
 

 ¶ 23. The ALJ considered the applicable law addressing whether a third-party assault was a compensable injury or if it was the product of a personal-vendetta that bore no relation to the claimant’s employment. International takes issue with the ALJ’s ruling that there needed to be a love triangle for the personal-vendetta exception to apply. However, what the ALJ found was that, in those cases in which the personal-vendetta exception has been applied, “there was no doubt that a love triangle existed and that the love triangle clearly [motivated] the non-employee to commit the tort against the employee.”
 
 See Big “2” Engine Rebuilders v. Freeman,
 
 379 So.2d 888, 891 (Miss.1980) (reviewing cases that denied compensation because the intentional tort was the result of a personal vendetta). In this case, the ALJ found that Davis’s motives as to why he shot Stephenson were unclear. “[I]n order for a claim to be compensable, there must be some causal connection between the employment and the injury. This causation may be minimal or even ‘reasonably incidental’ to the employment....”
 
 Id.
 
 at 890.
 

 II. Benefits
 

 ¶ 24. The claimant bears the burden of proving a loss of wage-earning capacity.
 
 McCarty Farms, Inc. v. Kelly,
 
 811 So.2d 250, 254 (¶ 11) (Miss.Ct.App. 2001)
 
 (McGowan v. Orleans Furniture, Inc.,
 
 586 So.2d 163, 167 (Miss.1991)). The determination of whether a claimant has suffered a loss of wage-earning capacity is a question of fact for the Commission.
 
 Id.
 
 (citing
 
 McGowan,
 
 586 So.2d at 167).
 

 1125. This Court has previously held that “when examining conflicting opinions by medical experts, ‘we will not determine where the preponderance of the evidence lies ... the assumption being that the
 
 *374
 
 Commission as trier of fact, has previously-determined which evidence is credible, has weight, and which is not.’ ”
 
 Rawls,
 
 2 So.3d at 679 (¶ 16) (quoting
 
 Hardaway Co. v. Bradley,
 
 887 So.2d 798, 796 (¶ 12) (Miss.2004)). The present issue involves the conflicting neuropsychological evaluations performed by Dr. Atkins and Dr. Hawkes. Dr. Atkins concluded that his examination of Stephenson was unreliable, and he saw no reason why she could not return to work. On the other hand, Dr. Hawkes found that her examination of Stephenson was sufficiently reliable, and she concluded that Stephenson was “not competent to be employed due to her memory problems as well as other cognitive deficits.” Dr. Atkins found fault with Dr. Hawkes’s testing of Stephenson, but he refused to reexamine her when the circuit court requested that he do so.
 

 ¶ 26. Dr. Hawkes testified as to a number of Stephenson’s problems that would preclude her from gainful employment. Stephenson was mentally deficient on a test of her memory of immediate material, which meant she would have trouble remembering or repeating things that people told her. Additionally, she did very poorly on the test of her visual-spatial functioning. That meant that she had problems dealing with shapes, mechanics, or seeing what was going on around her. Dr. Hawkes also found that Stephenson did poorly at reasoning and that she was withdrawn and depressed. In its order, the Commission summarized Stephenson’s px’oblems that Dr. Hawkes noted: “constructional dispraxia, impaired visual tracking and search skills, impaired visual-spatial memory, inability to cope with environmental visual-spatial interference, poor hypothesis testing, abstract pattern-perception issues, left upper extremity motor impairment, attention and concentration deficit, impaired perceptual problem solving, visual motor impairment, and visual and auditory memory impairments.... ”
 

 ¶ 27. Dr. Atkins found that most of Stephenson’s scores fell within the impaired range, but he felt that she could have performed better on the tests. He had no confidence in the results of his examination because he found that Stephenson gave poor effort and may have been exaggerating her symptoms. He also found Dr. Hawkes’s tests to be flawed and unreliable.
 

 ¶ 28. In examining the conflicting opinions of the experts, the Commission reasoned as follows:
 

 Dr. Atkins testified at some length that Dr. Hawkes’[s] evaluation and testing was flawed, and unreliable due to what he characterized as non-standardized testing methods. Despite, however, his strong testimony that Dr. Hawkes’[s] test data arid conclusions are unreliable, Dr. Atkins actually offered the opinion that, based on this test date, [Stephenson] was able to return to the same type of work as before her injury with no impairment or restrictions. This begs a huge question, of course, as to how Dr. Atkins can opine anything based on an evaluation carried out by Dr. Hawkes which he termed invalid, tainted[,] and unreliable. Dr. Atkins was not even able to opine anything with regard to [Stephenson’s] employability from his own evaluation because he had “no confidence in the validity of her neuropsycho-logical scores.” He obviously had even less confidence in the validity of Dr. Hawkes’[s] scoresf;] thus[,] his opinion of [Stephenson’s] permanent disability based on these very scores is itself suspect.
 

 In the end, Dr. Brophy apparently performed magnificently in treating [Stephenson] for the penetrating gunshot wound to the brain. Beyond this, Dr. Hawkes conducted a thorough neuropsy-chological evaluation of [Stephenson] and offered a very credible opinion, based on this evaluation, that [Stephen
 
 *375
 
 son] is permanently and totally disabled. Nothing in the testimony of Dr. Atkins convinces us that Dr. Hawkes’[s] opinion is flawed or otherwise unreliable.
 

 ¶29. After reviewing the expert testimony on each side, we find that the Commission’s decision was supported by substantial evidence, namely, the testimony of Dr. Hawkes. There was certainly competing testimony offered by Dr. Atkins. However, it is for the Commission, and not this Court, to judge the reliability of conflicting expert opinions. We do not find the Commission’s decision, to award Stephenson permanent total disability benefits, to be clearly erroneous or against the overwhelming weight of the evidence. This issue is without merit.
 

 ¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . This opinion will refer to the appellants, collectively, as "International,” unless it is necessary to distinguish between the parties.
 

 [2]
 

 . Stephenson was employed by International, which was a personnel outsourcing company, but she worked at the One Source facility.
 

 [3]
 

 . Terry Crane previously worked at One Source, but on the date of the shooting, he was there only to pick up his mother, Debra Bogan, who was a supervisor at One Source.
 

 [4]
 

 .This witness’s name is spelled several different ways throughout the record.