ROBERTS, J.,
Dissenting:
¶ 36. Although I am empathetic to Irene Hare’s plight, I must dissent as I find that we cannot reverse the decision of the Mississippi Worker’s Compensation Commission.
¶ 37. In 1985, Beverly Healthcare hired Hare as a licenced practical nurse (LPN). She worked in that capacity until the date of the accident, except for approximately three years during 1988 though 1991 while she recovered from a broken femur, which resulted from a slip and fall. As an LPN, Hare’s duties included distributing medication to residents, assisting certified nursing assistants (CNA) with their duties, and completing and updating medical charts. Hare typically worked from 2:45 p.m. until 11:45 p.m. and was responsible for the B wing, which included approximately twenty-eight residents. Hare testified that although her job required her to be on her feet for extended periods of time, it was not for the full eight-hour shift.
¶ 38. Hare reported for work at Beverly on April 25, 2005, which was her sixth day of work in a row. She was sixty-nine years old, approximately five-foot-four-inches tall, and she weighed approximately 160 pounds at this time. Once Hare clocked in, she began her customary duties. During this period of time Hare went to the smoking area at the back of the building and took a cigarette break with the nurses who were getting off the floor. At approximately 5:00 p.m., Hare clocked out for her thirty-minute lunch break. At the conclusion of her break, Hare returned and completed additional charts. At 7:00 p.m., she conducted a resident feeding at the end of the B wing. At the conclusion of the feeding, Hare began distributing the night’s medication from a cart as she worked her way from the end of the hall to the nurses’ station between the B wing and A wing. When she reached room nine, Hare’s left femur broke. She testified as follows: “I picked up my medicine. I got to the end of the cart and I didn’t get [my] water and I pivoted around on my leg to pick up my glass of water and my leg popped just like a shotgun.” The record shows that in a deposition taken prior to the hearing in front of the administrative judge (AJ), Hare stated that when she began to go in the patient’s room her “leg just popped.” There was no mention of pivoting or turning.
*234 ¶ 39. Hare testified that after the break, she fell on her medicine cart and held herself up as she called to Neda Kirk, who was a CNA on the floor. Hare never fell to the floor but was able to hold herself up long enough to be provided a chair. At the request of Hare, Kirk retrieved Megan Pannell, who was an LPN working on the A wing. She was soon after transported to Tippah County Hospital and later to Saint Francis Hospital in Memphis, Tennessee, where she was treated by Dr. Charles Taylor.
¶ 40. During cross-examination, Hare testified that prior to the April 25, 2005, fracture she had suffered numerous prior injuries to her left leg, left knee, left ankle, and left foot dating back to 1964, including a fracture of her left femur in 1998, which required the insertion of screws and a rod. Hare testified that the screws and rod were later taken out after she began to have problems with them. While she could not recall the exact date, Hare stated that the screws and rod were removed prior to the April 25, 2005, injury.
¶ 41. Hare testified that during her shift on April 25, 2005, her left knee was bothering her, and she told other employees that she planned to visit the emergency room after her shift was over. But she testified that she was ambulatory without the use of a walker or other device to assist her during her shift. Hare stated that because of the pain she had wrapped an Ace bandage around her knee prior to arriving at work. She claimed that no one re-wrapped the Ace bandage during her shift.
¶ 42. Pannell testified that Hare had walked with a limp as long as she had known her, but Hare’s limp was more pronounced than she had ever seen it during Hare’s shift on April 25, 2005. Pannell recalled that prior to their lunch break that night, Hare asked her to remove and re-wrap the Ace bandage. She testified that the bandage was on Hare’s upper left leg. Additionally, Pannell testified that she saw Hare using a walker as she made her way outside to go to the smoking area that night. This was the first time Pannell had seen Hare using a walker, and she did not see Hare using a walker at any other point that night.
¶ 43. Kirk worked for Beverly for twenty-one years and had worked with Hare for most of that time. She stated that Hare had always walked with a limp, but on April 25, 2005, Hare was having more problems walking than normal. Kirk testified that she saw Hare using a walker to go outside to the smoking area. Kirk heard Hare scream when the accident occurred and found her sitting in a chair. At Hare’s request, she informed Pannell that Hare was hurt. Kirk testified that when she returned, Hare asked her to cut away Hare’s pants around the fracture and the underlying bandage. Kirk stated that the bandage was approximately four inches above Hare’s knee.
¶ 44. Hare filed a petition to controvert claiming that she injured her leg on April 25, 2005, while in the course and scope of her employment at Beverly. After a hearing on the matter with the sole issue being whether Hare had a work-related accident, the AJ ruled that Hare met her burden of proof that her injury was work related in accordance with the Workers’ Compensation Act. Subsequently, Beverly filed a petition for review before the Commission. After a hearing, the Commission, in a majority decision of two to one, found that the AJ had erred in finding that Hare sustained a compensable injury on April 25, 2005. As such, the Commission reversed the AJ’s order and denied Hare’s claim for benefits.
¶ 45. Hare appealed the Commission’s decision to the Circuit Court of Tippah *235 County. After hearing argument from both parties, the circuit court reversed the order of the Commission. In its subsequent order, the circuit court found that “there exists clear evidence that [Hare] suffered an injury arising out of and in the course of her employment!,] and the employment clearly contributed to said injury.” Further, the circuit court held that the Commission’s decision was not supported by substantial evidence and was based upon an erroneous application of the Act.
¶ 46. Hare’s injury is compensable if it arose “out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated!,] or accelerated by the employment in a significant manner.” Miss.Code Ann. § 71-3-3(b) (Rev. 2000). Therefore, to present a prima facie case of compensability, Hare had to prove, by a fair preponderance of the evidence, the follow elements: (1) she sustained an accidental injury, (2) that arose out of and in the course of her employment, and (3) a causal connection exists between her injury and her claimed disability. Adams v. Lemuria, Inc., 738 So.2d 295, 297 (¶ 9) (Miss.Ct.App.1999). If Hare presented a prima facie case of disability, the burden to disprove disability shifted to Beverly. Id.
¶ 47. After reviewing the lay and expert testimony, the Commission found that Hare had “failed to present substantial and credible evidence of any accidental injury arising out of her employment. Instead, the evidence shows that [Hare’s] femur fracture was a natural progression of her 40[-]year history of injuries and surgeries of her left leg, and [it] merely occurred during the course of her employment.” In reversing the Commission’s denial of benefits, the circuit court focused mainly on what it viewed as a misapplication of the law on what constitutes an “accidental injury” as envisioned by the Act. The circuit court further found, without additional discussion, that “clear evidence [exists] that [Hare] suffered an injury arising out of and in the course of employment and the employment clearly contributed to said injury. Therefore, the Commission’s order, a majority opinion, is not based on substantial evidence.”
¶ 48. As stated above, the elements that Hare was charged with proving to the Commission were that: (1) she sustained an accidental injury, (2) which arose out of and in the course of her employment, and (3) the existence of a causal connection between her injury and her claimed disability. She carried the burden to prove each element by a preponderance of the evidence. Based upon the record before the Commission, and the standard of review this Court must follow, it is my opinion that the circuit court erred in reversing the Commission as there is substantial evidence in the record that supports the Commission’s finding that Hare failed to prove that her injury “arose out of’ her employment.
¶ 49. Although Hare was the only witness to the events that led to the injury she sustained, the testimony of Pannell and Kirk does shed some light on Hare’s condition on the evening of April 25, 2005. In addition to the credibility issues these conflicting testimonies raise, it also adds to the evidence that Hare was experiencing significant discomfort in the area around the site of her left leg that fractured later that night — discomfort she was experiencing prior to arriving at work on April 25, 2005. While it is apparent that Hare’s left femur fractured while she was at work, it is less clear that her employment with Beverly contributed to, or was the causal connection of, it.
¶ 50. Testimony concerning the causal connection between Hare’s injury and her *236 employment was presented by the parties’ experts. The two medical experts in the case testified by deposition and medical records. Dr. Taylor was the first to be deposed. He stated that he began treating Hare in the late 1980s or early 1990s. Dr. Taylor acknowledged that in the late 1990s he treated Hare for a fracture of her distal left femur by inserting a super con-dylar screw and plate. Hare later returned to Dr. Taylor as a result of a nonunion and plate failure. Dr. Taylor removed the plate and screws, filled the resulting empty spaces with bone graft or a bone substitute, and inserted a locking nail in the affected femur. Hare returned to Dr. Taylor in October 2004, complaining of pain surrounding the area where the screws had initially been inserted following her previous femoral fractures. Initial nonsurgical treatment had no beneficial effect so out-patient surgery was scheduled in December 2004, to remove the femoral rod and screws.
¶ 51. In his opinion, Hare’s previous femoral injuries had completely healed pri- or to the April 25, 2005, accident. When asked if the April 25, 2005, fracture was related to Hare’s previous injuries to her left leg Dr. Taylor stated:
I mean, it’s related. It is the same bone. The surgeries, especially the bone grafts that had to be done to get her to heal her original fracture are invasive in that they go in and you decrease the blood supply to that area. I mean, it is unavoidable to put the bone graft in.
So to that extent her bone is kind of forever weaker from what she has been through with her previous surgery, but, like I say, her next fracture was at a level further up the shaft, you know, well away from her original fracture.
[[Image here]]
[Hare’s] most recent fracture is at a different level, so it is a new injury. But it is through a bone that has obviously suffered because of the previous fractures and surgery to it.
Dr. Taylor stated that the April 25, 2005, fracture was approximately two inches and five centimeters away from her previous fracture and occurred through a screw hole that was left after the screws were taken out of her femur in December 2004. When asked if the screw hole was a contributing factor, Dr. Taylor stated that with a torsion or twisting injury it was not uncommon for the bone to find a weak spot to run through, and in this case, the fracture ran through the hole.
¶ 52. Dr. Taylor stated that Hare’s April 25, 2005, fracture could be characterized as a spontaneous fracture, which he defined as a fracture without obvious trauma. He testified that he had no way of knowing whether she had a torsional fracture through the screw hole or a stress fracture through the screw hole, and he stated that Hare’s April 25, 2005, fracture may have been a gradual stress fracture. However, when asked if working six to seven days a week as an LPN in a nursing home could have been a contributing factor in Hare’s fracture, Dr. Taylor stated: “I would think that whatever level of activity she had for the past few years I would expect her to have been able to continue. But you could create a stress fracture by increasing your activity faster than your bone can make new bone to respond to it.”
¶ 53. Dr. Guy Vise, a board certified orthopedic surgeon, was Beverly’s medical expert. The majority notes that at the time of his deposition, Dr. Vise spent half of his time as a professional expert witness and lists Dr. Vise’s rate schedule for the benefit of the opinion. Dr. Vise testified that at the time of the deposition he actually had three medical jobs. First, he saw *237 existing and new patients. Second, he performed medical consultation with various groups. And, third, he was the chairman of the board for two major orthopedic journals.
¶ 54. But while Dr. Vise’s focus of practice of the medical profession had shifted over the years, his extensive credentials and experience qualified him to give an expert opinion based upon only reviewing Hare’s medical records. Hare’s attorney obviously knew of Dr. Vise’s medical expertise and chose not to voir dire him during his deposition. As evidence of his vast experience, Dr. Vise submitted his curriculum vitae during his deposition. The following is a summary of its contents: graduated as a medical doctor from Tulane University School of Medicine in 1965; was a resident in hospitals in Louisiana, Georgia, and California from 1966-1970 while also serving in the United States Army Reserve; obtained his license to practice medicine in Mississippi in 1971; held numerous hospital and administrative positions; held numerous teaching positions and received several honors and awards as a result; held several positions on the boards of numerous professional societies; conducted various research and wrote several books and papers in the field of orthopedics; and, among other qualifications, examined the medical records of countless individuals in connection with his role as a medical expert.
¶ 55. Dr. Vise did not treat Hare, but he reviewed her medical records from Dr. Taylor, The Pain Clinic, Tippah County Hospital, St. Francis Hospital, Baptist Memorial Hospital, and Memphis Orthopedic Associates, as well as the depositions of Hare and Dr. Taylor and other miscellaneous documents. Dr. Vise opined that Hare had a spontaneous fracture of her femur on April 25, 2005. Dr. Vise then detailed previous injuries Hare had received to her left leg. These included: a fracture of the left ankle and left knee in 1964, which required open reduction/internal fixation of both the ankle and knee; crushing injuries of her left knee and ankle in 1987, which were treated by Dr. Taylor; a fracture of the left distal femur and intra articular fracture of her left knee from a slip and fall in 1998, which resulted in a total patel-lectomy; and pubic rami fractures without significant displacement when Hare stepped off a curb in 2000. In total, Dr. Vise summarized Hare’s injuries as two pelvic fractures, two fractures of the shaft of the femur, T/condylar fracture of the distal femoral-metaphysis, two fractures of the patella from crushing injuries, two fractures of ankle, and a fracture of the foot. Additionally, Dr. Vise listed several ailments he described as “significant pre[-]existing conditions/diseases.” These included: osteoporosis, long-term addiction to nicotine, significant arthritis of the knee, and sever weakness of the leg muscles.
¶ 56. Dr. Vise labeled Hare’s injury as a spontaneous fracture, a fragility fracture, and a stress fracture, but he explained that there was overlap in the use of those terms. In an accompanying report, he defined spontaneous fracture, quoting from Dr. Taylor’s deposition, as “a fracture that occurs without trauma or without a direct cause.” He testified that Hare was susceptible to this type of fracture for several reasons. The first reason was that the blood supply to that area and to the bone had been depleted as a result of the multiple surgeries she had received. Additionally, the numerous foreign bodies, or hardware, introduced into her leg, i.e. various plates, nails, and screws, disturbed the blood supply. Further, he stated that Hare’s arthritis, lack of strength in her left leg, and long history of smoking contributed to the April 25, 2005, fracture. Dr. Vise explained that smoking dramatically reduces a bone’s ability to heal. Further *238 more, Dr. Vise stated that the nail hole represented a stress riser, which he defined as a defect in the bone or hole in the bone that causes stress to concentrate in one area.
¶ 57. Dr. Vise stated that the proximate cause of Hare’s April 25, 2005, fracture was a weakened bone as a result of the December 2004, surgery to remove the nail from Hare’s left femur. Specifically, Dr. Vise stated that the removal of several nails and screws from Hare’s leg created additional stress on the bone. Although he did agree with Dr. Taylor that the April 25, 2005, injury was a new fracture, Dr. Vise qualified his agreement by stating that it was also a continuation or fragility fracture of a “diseased bone.” He explained that it takes a normal bone approximately 150 days to heal from a new fracture, the healing time almost doubles in individuals who smoke. He stated that given Hare’s medical history, “[her left femur] was an accident waiting to happen.” When asked if there was an untoward event that caused the fracture, he testified to a reasonable degree of medical certainty that Hare’s break was not caused by a specific event or trauma but was the result of the “activity of daily living.” He further explained during cross-examination that it was possible that working eight-to-twelve-hour shifts as an LPN could have had an effect on her left femur, but he explained that other activities of daily living would make the injury just as possible.
¶ 58. “[W]hen examining conflicting opinions by medical experts, we will not determine where the preponderance of the evidence lies ... the assumption being that the Commission as trier of fact, has previously determined which evidence is credible, has weight, and which is not.” Ameristar Casino-Vicksburg v. Rawls, 2 So.3d 675, 679 (¶ 16) (Miss.Ct.App.2008) (citations omitted). The Commission considered the expert testimonies of Dr. Vise and Dr. Taylor in making its finding that Hare’s April 25, 2005, fracture was not an accidental injury and did not arise out of her employment with Beverly. An injury is deemed to have arisen out of employment “if it contributed to or aggravated or [was] accelerated by the employment in a significant manner.” Miss.Code Ann. § 71 — 3—3(b). The supreme court has held that “arising out of’ employment requires that a causal connection between employment and the injury be shown. Big “2” Engine Rebuilders v. Freeman, 879 So.2d 888, 890 (Miss.1980). Further speaking to the requirement of proof of a causal connection between the employment and the injury, the supreme court has stated:
Prior to [the 1988] amendment, proof of the requisite causal connection was met by substantial evidence showing the injury to have arisen “out of and in the course of employment.” The phrase “arising out of’ does not require that employment be the sole cause of the injury. “Reasonable relation of employment and injury may involve minimal causation, less than needed for liability in the field of Torts.” See Big “2” Engine Rebuilders [,] 379 So.2d [at] 890. To be even minimally causative, Professor Bradley points out that conditions of employment must be some substantial or significant factor in bringing about the injury. J. Bradley, [Two Workers’ Compensation Law Amendments: Definition of “Injury” and Method of Stating Maximum Benefits 31 (May 13, 1988) (Paper published by Third Annual Mississippi Workers’ Compensation Educational Conference, Mississippi Workers’ Compensation Commission]), at 31 citing Sonford Products Corp. v. Freels, 495 So.2d 468 (Miss.1986); Dependents of Barrett v. Leake County Coop. (A.A.L.), 249 So.2d 387, 388 (Miss.1971).
*239 We hold that the addition of the phrase “in a significant manner” to section Yl — 3—8(b) states what was already implicit in the workers’ compensation law as interpreted by this court. Requiring the work and injury to be causally connected in a significant manner is nothing more than a requirement that the work connection be supported by substantial evidence as minimally causative of the injury.
KLLM, Inc. v. Fowler, 589 So.2d 670, 676 (Miss.1991).
¶ 59. The majority states that “the record is clear and without contradiction that Hare was in the process of performing the normal daily activity of working ... when she suffered a severe femur fracture.” However, the singular fact that an injury occurs while an employee is on the job does not create a compensable injury. Malone & Hyde of Tupelo, Inc. v. Hall, 188 So.2d 626, 630 (Miss.1966). There must be something related to the employment that at least minimally contributes to the injury. The Commission’s finding that Hare’s employment did not contribute to, aggravate, or accelerate her injury is substantially supported by the testimony of Dr. Vise and, to a lesser extent, Dr. Taylor. Dr. Vise explicitly stated that the proximate cause of Hare’s fracture was a weakened bone coupled with the activities of daily life. He further opined that other complications which contributed to her fracture included: osteoporosis, long-term addiction to nicotine, significant arthritis of the knee, severe weakness of the leg muscles, and a long history of trauma to her left leg. Dr. Taylor agreed with the fact that Hare’s left femur was weaker as a result of her medical history, but he maintained that the April 25, 2005, fracture was a new injury. However, Dr. Taylor never stated that any activity connected with Hare’s employment contributed to her injury and agreed that it may have been a gradual stress fracture.
¶ 60. To be clear, I do not argue that there is a complete lack of evidence in the record to support the majority’s position, and had the Commission found for Hare my position would certainly be different. However, my stance is that there is substantial evidence to support the decision of the Commission that Hare’s employment did not cause or contribute to the fracture of her left femur. Further, I certainly acknowledge, as the majority points out, that the worker is taken as she is found and that the Act is generally remedial in nature. However, neither of those considerations require the Commission to ignore relevant and reliable testimony showing that Hare’s employment did not contribute to her injury. I fear that the majority’s conclusion is tantamount to transforming Beverly, or any other employer, into an insurer or guarantor for all injuries to any of its employees who suffer an “untoward” event while on the job. I submit that this is not the intent of the Mississippi Workers’ Compensation Act. I would reverse the judgment of the circuit court and reinstate the Commission’s decision denying benefits.
GRIFFIS, J., JOINS THIS OPINION.