## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-WC-00929-COA

WALMART ASSOCIATES, INC. AND NEW                                    APPELLANTS
HAMPSHIRE INSURANCE COMPANY

v.

JOYCE CAULEY                                                         APPELLEE

DATE OF JUDGMENT:               07/31/2020
TRIBUNAL FROM WHICH             MISSISSIPPI WORKERS' COMPENSATION
APPEALED:                       COMMISSION
ATTORNEYS FOR APPELLANTS:       CASEY DALE YOUNGER
                                NICHOLAS DENSON GARRARD
ATTORNEY FOR APPELLEE:          TAYLOR RHUE BRINKLEY
NATURE OF THE CASE:             CIVIL - WORKERS' COMPENSATION
DISPOSITION:                    AFFIRMED - 06/15/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., McDONALD, McCARTY AND EMFINGER, JJ.

### McCARTY, J., FOR THE COURT:

¶1.     A longtime employee of Walmart suffered a work-related injury when the display at

the end of an aisle fell on her.  Walmart appeals the Mississippi Workers' Compensation

Commission's decision to affirm the administrative judge's award of benefits.  Finding that

the decision was supported by substantial evidence, we affirm.

### FACTS

#### A.     Cauley is injured at work.

¶2.     Joyce Cauley began working for Walmart nearly two decades ago.  In 2008 she was

hired as an assistant store manager at the Walmart in Laurel.  As an assistant manager,

Cauley was responsible for overseeing certain areas of the store. In addition to managing and training employees, she performed various tasks such as stocking shelves, building endcaps, zoning, cleaning, taking inventory, assisting customers, and more.

¶3. The day before Cauley's injury was Mother's Day. The store was particularly busy, and Cauley was the only manager working. She was juggling multiple tasks when she heard that a display at the end of an aisle had fallen twice in the garden center. Knowing the endcap could fall again, Cauley ordered that it be taken down.

¶4. The following day, Cauley began her shift by surveying the garden center as her manager had directed. She came upon the department manager who was stocking an endcap. Realizing it was the same endcap that had fallen twice the day before, Cauley again ordered that it be taken down.

¶5. Just as she told her colleague to "take it down now," the endcap fell on Cauley. She testified that the endcap "threw" her backward and knocked her left shoulder into a steel beam. She then fell across a low pallet and onto the cement floor. When asked at the administrative hearing whether she knew immediately that she was hurt, Cauley responded, "Actually, at that time, I was just stunned and numb" and "I couldn't feel anything."

**B.    Cauley receives treatment.**

¶6. Cauley notified Walmart of her injury and sought treatment the day of the incident—May 9, 2016. She was diagnosed with contusions to her shoulder and back. The clinic report noted that she was experiencing constant aching and throbbing in her back, left shoulder, and arm. She was given medication and the following restrictions: "Overhead

working may not be performed. Pushing and pulling should not be performed. Carrying should be limited to 10 pounds or less. Reaching overhead may not be performed."

¶7. Cauley returned to the clinic two days later with pain in her left shoulder and arm, right shoulder, back, and pelvic area. She was diagnosed with contusions to her left and right shoulders, lower back, and pelvis and given the same work restrictions as her previous visit. The doctor referred her to Southern Bone & Joint Specialists for further evaluation.

¶8. About a week later, Cauley began treatment with Dr. Michael Patterson at Southern Bone & Joint. She presented with a low-grade ache in her left shoulder and pain radiating from her lower back to her buttocks and thighs. Dr. Patterson noted in his report that this pain was not present before the work accident but was present afterward. X-rays of her lower back did not reveal fractures or dislocations. For treatment Dr. Patterson recommended medication and physical therapy to regain range of motion in her shoulder. He determined that Cauley was unable to work.

¶9. The following week, Cauley underwent an occupational therapy evaluation. It was estimated Cauley would need at least six weeks of therapy and that she could progress to full functional use for work-related responsibilities.

¶10. For the next several months, Cauley continued treatment at the clinic. She attended multiple physical therapy sessions per week. She reported "a lot of back pain" and described it as moderate to severe, with symptoms flaring during mild activity. Cauley said that the pain subsided with medication.

¶11. She complained of numbness, tingling, and other sensations in her neck, arms, and

3

back. She testified at the hearing that she felt like she had "bugs crawling" on her arm. Dr. Patterson ordered MRIs of Cauley's cervical and lumbar spine, which revealed an ossified disk herniation but no other acute problems. He also recommended Cauley undergo a work-conditioning program. He noted that Cauley was still unable to work but that she "is interested in getting back to work and says it is a good job that she needs to continue to keep."

¶12. Over the next few months, Cauley slowly progressed through her treatment plan despite pain in her left shoulder, neck, and lower back. She continued with physical therapy and the work-conditioning program, though her attendance was sporadic. One report noted she was in so much pain that she did not attend treatment. Nonetheless, she showed improvement, adjusting well to additional light lift-and-carry exercises in therapy. One report stated that Cauley was "overall able to perform exercises with good form."

¶13. Dr. Patterson ordered Cauley complete additional work conditioning then return to work on September 1, 2016, with restrictions. He stated that she was "permitted to engage in a light level of work activity, which means lifting 20 pounds maximum, frequent lifting or carrying of objects that weigh up to 10 pounds, walking or standing to a significant degree, or sitting most of the time with pushing and pulling or arm/leg controls."

**C.    Cauley returns to work and continues treatment.**

¶14. Cauley resumed her role as assistant manager at the Laurel Walmart in September 2016, receiving the same pay as before her injury. However, she was only able to return to work with accommodations. The accommodations were through medical restrictions and

4

occasional leaves of absence.

¶15.    Meanwhile, Cauley continued treatment with Dr. Patterson.  He conducted a muscle and nerve evaluation, which revealed a pinched nerve in the cervical spine.  A functional capacity examination (FCE) was conducted to determine Cauley's ability to perform work tasks.

¶16.    The FCE showed that Cauley was able to perform 76.2% of the physical demands of her assistant manager job.  The report stated that Cauley put forth full effort and was able to perform within the light physical demand category with occasional lifting up to 20 pounds below waist height and that she could occasionally tolerate reaching above her shoulders, bending, kneeling, and crawling.  It included a recommendation of 1% whole person impairment and that Cauley could return to work full time with restrictions.

¶17.    Cauley began treatment with pain management specialist Dr. Brian Trussell in 2017 and has seen him regularly since then.  Dr. Trussell has pursued non-surgical treatment options including nerve injections and medication.

¶18.    Upon initial evaluation, Dr. Trussell noted that Cauley was experiencing pain in her back, neck, left shoulder, and left arm with numbness in her fingers.  The pain was exacerbated by sitting, standing, leaning forward, lying on her back, lying on her stomach, driving, walking, and exercising.  He diagnosed her with cervical pain, degeneration of the lumbar spine, and bilateral mid-thoracic pain.  He expressed concern that Cauley had not been treated for her thoracic-spine pain and that it was possible she had an injury in the upper thoracic causing her shoulder pain.  He noticed tenderness in the area of her body that hit a

5

steel beam during her work injury and ordered x-rays and an MRI to evaluate. After reviewing the scans, Dr. Trussell recommended nerve blocks to ease the pain.

¶19.    Over the next several months, Cauley received nerve blocks that temporarily relieved 80-90% of her pain. Dr. Trussell confirmed his initial diagnosis of lumbar spondylosis based on her response to these injections. Cauley also underwent radio-frequency ablation, a non-surgical procedure used to reduce nerve pain. The procedure temporarily relieved 75% of the pain in her back.

¶20.    Dr. Rahul Vohra conducted an employer medical evaluation (EME) on Cauley in October 2017. Dr. Vohra believed Cauley was at maximum medical improvement (MMI) with regard to her cervical spine and thoracic spine with a 1% impairment rating to the body as a whole. Dr. Vohra agreed with Dr. Trussell's recommendation of radio-frequency ablation and opined that if the procedure was unsuccessful, Cauley would be at MMI with regard to her lumbar spine with a 2% body-as-a-whole impairment.

¶21.    Despite Dr. Trussell's treatments, Cauley's pain persisted, with additional aches in her hips, buttocks, and thighs. He diagnosed her with pelvic inflammation, lumbar-spine degeneration, and thoracic pain. He prescribed medication and ordered additional injections to alleviate her pain. The injections provided relief for a couple of days before the pain returned. Although Cauley experienced difficulty performing daily tasks, she continued working.

¶22.    Over the next year, Cauley received more nerve blocks and continued radio-frequency ablation. Coupled with medication, this treatment provided some relief, as Cauley noted

6

increased function, improved ability to work, and overall better quality of life.

¶23. Cauley continued to report pain in her back, shoulder, and arm, as well as tingling in her forearm and fingers. Cauley noted increased lower back pain, which Dr. Trussell's report described as "stabbing, burning, aching, shooting, and radiating." She also reported severe muscle spasms in her back. Dr. Trussell ordered additional MRIs, which revealed internal disk disruption and nerve damage in the lumbar spine, along with mild spinal degeneration. He also administered an epidural steroid, among other injections.

¶24. Cauley returned to Dr. Vohra, who opined that Cauley had reached MMI and suffered an impairment rating of 2% to the whole body. Dr. Vohra recommended another FCE and medium level work restrictions. He claimed that additional procedures would not be beneficial but that intermittent use of medication could still provide some relief.

¶25. Dr. Trussell agreed with Dr. Vohra's latest finding of MMI but hesitated to designate an impairment rating before the next FCE. He continued to place Cauley on light work duty. Both doctors agreed Cauley was not a surgical candidate.

¶26. Cauley's pain, particularly the burning and aching back pain and tingling in her arms, persisted into 2019—three years since her work injury. Cauley expressed that her pain was exacerbated by walking, sitting, standing, lying down for extended periods, prolonged activity, and bending backward and alleviated by sitting, heat, stretching, and medication. At that time Dr. Trussell ordered an FCE and placed her at MMI pending the results. He also kept her on light work duty. He believed she would no longer benefit from procedures but that annual physical therapy would help.

¶27.   An FCE was conducted.  The FCE report stated:

> Ms. Cauley demonstrated the ability to perform work at the Medium level . . . with the willingness to perform manual material handling tasks at the Light level.  Ms. Cauley has a decreased capacity due to low back pain and fatigue. She was unable to complete the repetitive squat task and the kneeling task due to pain and fatigue.  She was also limited on floor to waist lifting, pushing, pulling, unilateral and bilateral carrying tasks.

The report also explained that due to Cauley's "self-limiting and inconsistent behavior" during the evaluation, her maximum work capacity could not be determined at that time.

¶28.   Cauley later testified about the difficulties she encountered in completing the FCE. While the FCE report noted "self-limiting and inconsistent behavior," Cauley testified that the only reason she stopped certain activities was because she was in significant pain.  Letters from Dr. Trussell support this contention.  She stated that the FCE exercises brought on "bad" symptoms and explained, "My back draws up on me.  It gets real stiff.  Shooting pains."  She testified that during the lifting and placing boxes exercise "it just got to where I couldn't do it.  I'd have to stop.  At one point, I actually almost fell."

¶29.   Following the FCE, Cauley reported continued back and shoulder pain.  Dr. Trussell noted that the pain was "intermittent, worse in the morning and evening, and described as aching, shooting, and throbbing in nature."  He ordered an MRI of her shoulder, which Walmart did not approve.

### D.   Cauley receives accommodations at work.

¶30.   Cauley continued working as an assistant manager at the Laurel Walmart with accommodations in the form of medical restrictions and leaves of absence.  But even with the accommodations, Cauley faced limitations due to her work injury.  At the hearing before

8

the AJ, Cauley testified as to the difference in her work abilities before and after her injury.

¶31. Before her injury, she worked 9-, 10-, and 12-hour shifts—sometimes more—and had no problem being on her feet all day. She testified that she regularly helped unload trucks and stack and move pallets. She stated, "Before I had the injury, I mean, I could unload almost, not all, but the majority of the freight." According to Walmart the role of assistant manager does not require lifting more than 25 pounds. However, Cauley testified that she lifted items weighing 50 to 60 pounds. She also stacked and pulled pallets and stocked shelves, which required her to reach overhead and crouch down for extended periods of time. Cauley testified that she had no problem doing her job prior to her work injury.

¶32. After her injury, Cauley struggled to perform basic duties at home and at work. Her medical records reflect that she could not bring herself to complete household chores. She had trouble arranging items on lower shelves at work. She testified, "I've actually had somebody have to come pick me up out of the floor." She still suffers from back and shoulder pain, as well as tingling in her arms. She testified that she still feels the "bugs crawling" on her arm and that her "arm goes completely to sleep."

¶33. In addition to following medical restrictions, Walmart allowed Cauley to take a number of intermittent and personal leaves of absence. On two occasions Dr. Trussell completed FMLA forms outlining the terms of intermittent leaves of absence. The first intermittent leave of absence was granted in September 2018. Dr. Trussell stated that due to her injury, Cauley would experience episodic flare ups that would prevent her from performing essential functions of her job. He wrote, "Patient may experience severe pain

9

causing inability to work." Accordingly, he stated that she would need to miss work for two-day periods twice a month.

¶34. Dr. Trussell ordered a new intermittent leave of absence that would be in effect for one year beginning January 31, 2019. He again noted that Cauley would experience episodic flare ups and "increased pain during flare ups causing inability to function/work." Under this leave, Cauley was permitted to miss work 2 to 3 times per month, 3 to 4 days per episode.

¶35. Cauley was also granted personal leaves of absence to care for her brother, who struggles with severe long-term injuries from a near-fatal car wreck. She testified that her brother requires assistance with basic functions like eating, moving around, and getting to doctors' appointments. Her brother was essentially unable to walk and uses an electric wheelchair. Cauley is one of the few people able to care for him.

### E. Cauley is placed on "inactive status."

¶36. Cauley took a personal leave of absence to care for her brother in early 2019. Walmart granted that leave, which was set to expire on May 15, 2019. She was scheduled to return to work on May 16. Cauley testified that she fully intended to return to work that day but experienced back pain that prevented her from coming to work. She did not go to work on May 16, 17, or 18.

¶37. Cauley testified that she contacted her manager Manny Martinez to tell him she would not be at work on May 16. She further testified, "I contacted Manny and told him I wasn't coming in, and he said okay." When asked by counsel whether she told Martinez why she would not be at work, she responded, "I believe I told him it had to do with my back because

10

I have back spasms."

¶38. Cauley missed work May 16-18 but showed up early for her shift on May 19. A few hours after Cauley's arrival, Martinez called her into his office. According to Cauley, Martinez told her that he wanted to give her a chance to "get around and talk to everybody" and that he was "going to have to take my keys and radio." He then informed Cauley that she was being placed on inactive status for 30 days and that Walmart was in the process of replacing her.

## F. Cauley searches for a job and continues treatment.

¶39. The manager told Cauley she would have to search for new jobs on "the Wire," an online portal for Walmart employees. She would have 30 days to look for a position at another Walmart store before being terminated. While in his office that day, Martinez and Cauley accessed the Wire but found no jobs available. He told her to check back periodically and to contact the human resources manager as she would help Cauley relocate to another store. Cauley called HR Manager Nikki Williams later that day and told her what Martinez had said. According to Cauley, the HR manager said she "had no business calling her, and not to call her again."

¶40. Cauley encountered obstacles when applying for positions within Walmart. She testified that she logged on to the Wire several more times after the day she checked it with Martinez. First, she attempted to apply for a position at the Laurel Walmart but was blocked from applying at that store because of her inactive status. However, the system did allow her to apply for an asset protection management position at the Laurel store, but she was not

hired.

¶41. According to Cauley, the only other available positions were for trainees. Because she was already a manager, she was unable to apply for trainee positions within the system. The Wire would not allow her to apply for jobs below that of assistant manager.

¶42. She contacted Martinez to request she be reinstated in her old position as assistant manager, which he denied. When asked at the hearing whether she would have accepted her old job if offered reinstatement, Cauley responded, "Yes." She also asked Martinez for advice in navigating the Wire. Martinez suggested she consider hourly positions, department management, or other jobs. Cauley testified that she did try to apply to those types of positions but that the system said she was not qualified.

¶43. Martinez then told her to contact Melody at the Market HR office to ask that she open an exception for Cauley to apply for jobs below the assistant-management level. When Cauley called, Melody asked which jobs interested her. Cauley testified, "I told her any of them, as I just needed a job." After requesting the exception, Cauley checked the Wire and found the only available jobs were at the Laurel store, where they would not hire her due to her inactive status.

¶44. Cauley also reached out directly to contacts at other Walmart locations to ask about any potential openings. She testified that she contacted an employee at the store on Highway 49 and was told they had no positions available. She also called an employee at the Petal store several times but was unable to reach her.

¶45. Despite claiming that Cauley would be terminated after 30 days of inactive status,

Walmart never fired her. As of the date of her administrative hearing, Cauley still had not been terminated. When asked why Cauley was not terminated after 30 days, the HR manager responded, "I don't know." Walmart filled Cauley's position within a month of placing her on inactive status, yet the company maintained her employment.

¶46. After hitting a brick wall, Cauley expanded her job search beyond Walmart. According to her resume, she was experienced in retail management, sales, sewing, and decorating. Residing in southeastern Jones County, Cauley applied for jobs in Ellisville, Laurel, Petal, and Hattiesburg. She testified that Laurel and Petal are both about a thirty minute drive from her house and that it takes longer to get to Hattiesburg. From May to September 2019, Cauley applied for at least 14 jobs in her area and beyond.

¶47. In July, Cauley filed applications with Lowe's, Comcast, Team Builders, and a child care provider in Ellisville. The next month she posted her resume on Indeed.com. She applied for jobs at BancorpSouth and Carter's Jewelry in Petal. She applied for an assistant manager position at Krispy Kreme Doughnuts in Hattiesburg, and she called Lenny's in Hattiesburg to ask if they were hiring. In September she filed applications for the following jobs in Hattiesburg: office assistant at Furniture Direct, assistant manager at Kirkland's, sales associate at Michael's, receptionist at Wellness Center, call center at Maximus, and sales associate at Jo-Ann's Fabric and Craft. She also applied to be a customer service associate at Lowe's in Petal.

¶48. While searching for a job, Cauley continued treatment with Dr. Trussell. He wrote the following in a letter to Walmart counsel:

13

After having worked with this patient for a period of time, I do recognize her willingness and desire to return to work and note she has had some significant difficulty with pain. Based on the functional capacity evaluation and her visit with Dr. Vohra, I do believe the patient is most likely at a medium-duty work level. I do also believe the patient should be limited to lifting no more than 50 pounds occasionally and should only be able to squat, stoop, or kneel occasionally. I feel the patient would be able to perform minimal tasks with her hands frequently with weights less than 10 pounds.

¶49. Cauley's last visit with Dr. Trussell was in September 2019. He reported that her pain persists and "is exacerbated by walking, sitting, standing, lying supine, prolonged activity, and bending forward and is alleviated by changing positions, medications, heat, as well as rest." He also noted, "She has reached a point to where she is unable to proceed with any new treatment regimen although we have ordered MRI of the left shoulder and physical therapy, which are not approved."

¶50. The week before her administrative hearing, Cauley got a job through her Indeed.com post as a head cashier at Lowe's in Petal earning $13.98 an hour. Cauley testified at the hearing that this position is similar to that of customer service manager at Walmart—a position she would have taken if offered or available to her.

**COURSE OF PROCEEDINGS**

¶51. Cauley filed a petition to controvert naming Walmart as her employer and New Hampshire Insurance Company as its carrier.

¶52. The administrative judge (AJ) conducted a hearing. The parties stipulated that Cauley's average weekly wage was $948.25 and that she suffered a 2% impairment rating to the body as a whole. The AJ heard testimony from Cauley, Laurel Walmart Manager Manny Martinez, and Walmart Market HR Manager Nikki Williams.

14

¶53. Martinez testified that Cauley was placed on inactive status because of the number of days she missed work during the year. He explained that the Laurel Walmart was an "Academy," meaning employees throughout the region trained at that store, so manager attendance was especially important. He stated that it was "a business decision made for that store" to place Cauley on inactive status, whereby she could not work at the Laurel location and would have 30 days to find a position at another Walmart.

¶54. Regarding the reason Cauley missed the days for which she was placed on inactive status, Martinez provided the following testimony:

> Q.    And the days she missed throughout the year, do you know why she missed those days?
>
> A.    Due to her back. The days that she called out?
>
> Q.    Yes.
>
> A.    Due to her back.

¶55. Martinez attempted to clarify that 52 of Cauley's absences were allegedly "in question" because 24 absences were not reported and another 28 were denied. But when asked on cross why Cauley missed those days in question, Martinez again responded, "Due to her back."

¶56. Martinez spoke about his impression of Cauley based on his time as her colleague.

> Q.    . . . So based on your knowledge and experience of working with Ms. Cauley, if she were to apply to another assistant management job at any of the other local stores, do you think she would have been hired?
>
> A.    I believe she has the ability; and if they, you know, would have interviewed her with her being seasoned, she would have been a good candidate.

15

Q. But in order to get an interview, you have to apply for a job. Right?

A. Yes, sir.

Q. All right. So let me ask you this: Was she a solid employee?

A. Yes, sir.

Q. When she was at work?

A. Absolutely.

¶57. Like Martinez, Williams testified that Cauley was placed on inactive status because she missed an excessive number of work days. As HR manager, Williams was responsible for overseeing Cauley's leaves of absence. In her testimony, she acknowledged that Cauley had taken leaves of absence due to her work-related injury and to care for her brother. Williams and Cauley exchanged a series of text messages during and after her most recent leave of absence. Responding to Cauley's message explaining why she had not contacted her, Williams sent the following: "There is no need for excuses. Do what you must to heal; and once you return to the workplace, your store manager will speak with you. Enjoy the rest of your evening."

¶58. Williams also testified about Cauley's work performance. When asked whether Cauley had the experience for an assistant manager position at another Walmart, Williams stated, "Absolutely." She noted, "[S]he's a solid performer, and she works in a facility where top talent is typically promoted from that store."

¶59. The AJ ruled in a detailed, thirty-three-page decision. She determined that Cauley reached MMI on December 7, 2018, and found that Cauley suffered a 25% loss of wage-

16

earning capacity. The AJ found that Cauley's job search was adequate and not a "mere sham." She awarded temporary total disability benefits in the amount of $468.63 per week from the date of injury to the MMI date with credit for wages paid during that time and permanent partial disability benefits in the amount of $158.04 per week beginning immediately after the MMI date. The award also included any penalties and interest and medical services and supplies applicable under statute.

¶60. The Commission adopted and affirmed the AJ's decision. Walmart timely appealed, arguing five assignments of error. For clarity, we combine some of the issues raised.

## STANDARD OF REVIEW

¶61. The Commission is the ultimate finder of fact in workers' compensation cases. *Pruitt v. Howard Indus. Inc.*, 232 So. 3d 822, 825 (¶7) (Miss. Ct. App. 2017). "When the Commission accepts the findings and conclusions of the administrative judge, this Court reviews those findings and conclusions as those of the Commission." *Id*.

¶62. "Our scope of review in workers' compensation cases is limited to a determination of whether the decision of the Commission is supported by substantial evidence." *River Regions Health Sys. v. Adams*, 115 So. 3d 863, 866 (¶13) (Miss. Ct. App. 2013). "We will only reverse the decision of the Commission if it is clearly erroneous and contrary to the overwhelming weight of the evidence." *Id*.

¶63. We review questions of law de novo. *Prairie Farms Dairy v. Graham*, 270 So. 3d 37, 41 (¶9) (Miss. Ct. App. 2018). Absent error of law, this Court must affirm the Commission's decision so long as it is supported by substantial evidence. *Id*.

17

## I. Substantial evidence supported the AJ's findings regarding loss of wage-earning capacity.

¶64.   Walmart challenges the AJ's findings regarding loss of wage-earning capacity. Namely, Walmart argues that Cauley failed to overcome the rebuttable presumption of no loss of wage-earning capacity.  The employer further claims that  Cauley failed to establish a prima facie case of loss of wage-earning capacity and that the AJ erred in determining Cauley suffered a 25% loss of wage-earning capacity.

¶65.   Cauley received permanent disability benefits for her body-as-a-whole injury.  A "disability" for the purpose of workers' compensation is an "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment."  Miss. Code Ann. § 71-3-3(i) (Rev. 2011).  "[T]he concept of disability comprises a physical injury coupled with a loss of wage-earning capacity."  *Ameristar Casino-Vicksburg v. Rawls*, 2 So. 3d 675, 680 (¶20) (Miss. Ct. App. 2008).  Therefore, a claimant can only receive permanent disability benefits for a body-as-a-whole injury if the injury resulted in a loss of wage-earning capacity.  *Id*.

### A. Cauley overcame the rebuttable presumption against loss of wage-earning capacity.

¶66.   Walmart argues that because Cauley returned to her pre-injury wages, a rebuttable presumption that she suffered no loss of wage-earning capacity applies.[1]  Walmart further

---

[1] Walmart also argues that the AJ erred in finding Cauley temporarily totally disabled for the period during which she worked and received full wages.  However, Walmart did not mention this in its statement of the issues and cited no authority supporting the contention as required under our rules of appellate procedure. M.R.A.P. 28(a)(3), (7).  Therefore, we

argues that Cauley failed to overcome that presumption.

¶67.    The Mississippi Supreme Court has held, "A rebuttable presumption of no loss of wage-earning capacity arises when the claimant's post-injury wages are equal to or exceed his preinjury wage." *Gregg v. Natchez Trace Elec. Power Ass'n*, 64 So. 3d 473, 476 (¶12) (Miss. 2011).

¶68.    Here, Cauley returned to her job as an assistant manager at Walmart a few months after her work injury. She earned the same wages as she did prior to the injury. Therefore, a rebuttable presumption existed that Cauley did not suffer a loss of wage-earning capacity.

¶69.    However, this presumption is not necessarily determinative. A claimant can rebut the presumption of no loss of wage-earning capacity by showing that her post-injury wages are unreliable due to, among other factors, "the temporary and unpredictable character of post-injury earnings." *Weathersby v. Miss. Baptist Health Sys. Inc.*, 195 So. 3d 877, 883 (¶25) (Miss. Ct. App. 2016). "[A]ny factor or condition which causes the actual post-injury wages to become a less reliable indicator of earning capacity will be considered." *Gen. Elec. Co. v. McKinnon* 507 So. 2d 363, 365 (Miss. 1987).

¶70.    Here, Cauley's wages upon her return as assistant manager at Walmart were not a reliable indicator of her capacity to earn wages because her post-injury employment with Walmart was temporary. Following her injury in May, Cauley was unable to work until September of that year. Further, missed days due to her injury led to her effective termination in May 2019. Her post-injury Walmart wages were also unpredictable, as her

do not address it on appeal.

ability to continue the job depended on the grant of accommodations from her physician and her employer.

¶71.   A claimant may also rebut the presumption against loss of wage-earning capacity by showing "payment of wages disproportionate to capacity out of sympathy to claimant." *Univ. of Miss. Med. Ctr. v. Smith*, 909 So. 2d 1209, 1219 (¶32) (Miss. Ct. App. 2005).  This Court has held that "wages attributable to the kindness and generosity of an employer are not indicative of the employee's actual capacity to command a certain wage on the open labor market." *Id*. at 1221 (¶43).  This includes situations in which an employer makes efforts to accommodate an injury. *Id*.

¶72.   Here, Cauley was only able to continue her job at Walmart because she was granted accommodations in the form of physician-ordered restrictions and intermittent leaves of absence.  The record indicates that without those accommodations, Cauley could not have performed the essential functions of her job.  For example, the role of assistant manager required Cauley to conduct at least some manual labor, such as stocking shelves and zoning. Cauley also testified that she regularly helped unload trucks and stack pallets, even though she was not necessarily required to do so.  She was afforded restrictions on certain movements and tasks such as lifting and reaching.  Intermittent leaves of absence allowed Cauley to miss work when she experienced episodes of severe pain.  Cauley's reliance on these accommodations make her post-injury Walmart wages unreliable as an indicator of her actual capacity to earn wages in the open labor market.

¶73.   Furthermore, the uncontested testimony of her manager makes clear Walmart was

20

accommodating Cauley. When asked why she missed so many work days throughout the year he stated, "Due to her back." Martinez testified twice he understood Cauley had to miss work due to her injury.

¶74. Walmart relies primarily on the Mississippi Supreme Court decision *Omnova Solutions Inc. v. Lipa*, 44 So. 3d 935 (Miss. 2010), and its progeny to argue that Cauley failed to rebut the presumption of no loss of wage-earning capacity. In *Omnova*, the claimant, Lipa, returned to her pre-injury job earning her pre-injury wages following a work-related injury. *Id*. at 936 (¶1). Therefore, the rebuttable presumption of no loss of wage-earning capacity applied. *Id*. Sometime after returning to work, Lipa was demoted and replaced from her pre-injury position. *Id*. The AJ found that Lipa had suffered loss of wage-earning capacity. *Id*. at (¶2).

¶75. The Mississippi Supreme Court stated that the AJ's finding of loss of wage-earning capacity "was reached—at least in part—based on Lipa's loss of her preinjury position, which decidedly was due to the union contract, not her injury." *Id*. at 942 (¶20). For this reason, the Court remanded the case for a hearing to determine whether Lipa rebutted the presumption of no loss of wage-earning capacity "without consideration of the fact that Lipa lost her preinjury job" due to reasons unrelated to her injury. *Id*.

¶76. The present case differs from *Omnova* in a critical way. In *Omnova* the AJ found that the claimant was fired from her job for reasons completely unrelated to her injury. *Id*. at (¶19). The Court noted that the AJ "failed to connect Lipa's acknowledged loss in wages to a work-related injury." *Id*. Yet in this case, the AJ fully explained the reason for Cauley's

effective termination in her decision:

> It was because of these missed days that employer made the decision to terminate her from the position . . . . Her supervisor testified at the hearing that this decision was made due to the fact that she had missed several days over the previous year. He also testified that the reason for those missed days was due to her work related back injury.

The AJ specifically cited testimony from Martinez revealing that Cauley was placed on permanent inactive status for days missed "due to her back." Unlike in *Omnova*, the AJ found that Cauley suffered a loss of wage-earning capacity due to her work-related injury.

¶77. Given this distinction, we find that substantial evidence indicated that Cauley overcame the presumption against loss of wage-earning capacity by showing her post-injury Walmart wages were not a reliable indicator of her capacity to earn wages.

### B. Cauley established a prima facie case of loss of wage-earning capacity.

¶78. Walmart argues the AJ erred in finding that Cauley established a prima facie case of loss of wage-earning capacity. Specifically, Walmart claims that Cauley failed to show that her injury resulted in a diminished wage-earning capacity.[2]

¶79. "The burden is on the claimant to prove an industrial injury by showing medical impairment and that the medical impairment resulted in a loss of wage earning capacity." *Bryan Foods Inc. v. White*, 913 So. 2d 1003, 1009 (¶26) (Miss. Ct. App. 2005). Courts consider multiple factors in determining loss of wage-earning capacity: "(1) an increase in general wage levels, (2) increased maturity or training, (3) longer hours worked, (4)

---

[2] Walmart also alleges that Cauley failed to establish a prima facie showing of loss of wage-earning capacity because her job search was inadequate. We address the job search issue in full in Section II of this opinion.

22

sympathy wages, (5) temporary and unpredictable character of post-injury earnings, (6) employee's inability to work, (7) employee's failure to be hired elsewhere and (8) the continuance of pain and other related circumstances." *Id*.

¶80. The evidence and testimony presented at the administrative hearing satisfy several of these factors. First, Cauley's post-injury wages were temporary and unreliable for reasons previously discussed. Cauley also demonstrated an inability to work without accommodations. Medical records from the dozens of appointments in the years following Cauley's work-related injury show that she continues to experience severe, disabling pain that interferes with her ability to work. Furthermore, despite a reasonable job search, Cauley is currently working an hourly job earning significantly less money than she did as an assistant manager at Walmart.

¶81. In its brief, Walmart states that Cauley's decrease in wages is a result of "her failure to return to work on time, and failure to re-apply for any similar position." Walmart further claims Cauley was replaced "due to her own actions entirely unrelated to her work injury." These assertions are clearly contradicted by the evidence, namely the testimony from Cauley's manager. Martinez agreed on cross-examination that Cauley was placed on inactive status not because she had missed two days following the expiration of her personal leave of absence, but because she had missed several days throughout the year. He admitted he was aware Cauley missed those days because of her work injury.

> Q. And the days she missed throughout the year, do you know why she missed those days?
>
> A. Due to her back. The days that she called out?

23

Q. Yes.

A. Due to her back.

Martinez also stated that Cauley's absences "in question"—those that were either denied by or unreported to the employer—were "due to her back."

¶82. Given this, we find that substantial evidence supported the AJ's decision that Cauley established a prima facie case of loss of wage-earning capacity.

### C. Substantial evidence supported the AJ's determination of 25% loss of wage-earning capacity.

¶83. Walmart challenges the AJ's finding that Cauley suffered a 25% loss of wage-earning capacity. Specifically, the employer argues that the AJ "erred as a matter of law and fact by failing to consider the medical proof," and that the determination of 25% loss of wage-earning capacity is against the overwhelming weight of the evidence.

¶84. "[D]ecisions as to loss of wage-earning capacity are largely factual and [are] to be left largely to the discretion and estimate of the commission." *Neshoba Cnty. Gen. Hosp. v. Howell*, 999 So. 2d 1295, 1298 (¶8) (Miss. Ct. App. 2009) (quotation marks omitted). The fact-finder must consider the evidence as a whole. *Id*. at 1300 (¶16). Courts weigh a number of factors in evaluating loss of wage-earning capacity. *Bryan Foods*, 913 So. 2d at 1009 (¶26).

¶85. Walmart argues that the AJ failed to consider the undisputed medical proof that Cauley suffered a 2% impairment rating to the body as a whole. However, the AJ specifically referred to the 2% impairment rating six times in her decision, including in her analysis of loss of wage-earning capacity: "Dr. Vohra's 2% rating was to the body as a

24

whole. When presented with Dr. Vohra's report, Dr. Trussell concurred with the impairment rating to the body as a whole."[3]

¶86. Finally, a finding of 25% loss of wage-earning capacity was not against the overwhelming weight of the evidence. In her decision, the AJ stated that the evidence must be considered as a whole. She then discussed the particular evidence that contributed to her determination of loss of wage-earning capacity. In addition to citing the impairment rating and Cauley's persistent pain, the AJ pointed out the numerous ways the claimant's injury has led to her diminished wage-earning capacity. For example, medical records and testimony show that Cauley is unable to work without accommodations, as she continues to experience painful, episodic flare ups due to her injury at Walmart. Testimony established that Cauley was effectively terminated from her position at Walmart and has since only been able to find a lower-level job earning significantly less than before her injury.[4]

¶87. Because the AJ's determination of 25% loss of wage-earning capacity was supported by substantial evidence, we affirm.

## II.    Substantial evidence supported the finding that Cauley's job search

---

[3] The AJ also noted that the employer's refusal to allow the physician-ordered MRI of Cauley's left shoulder made it difficult to ascertain the extent of her impairment.

[4] Though not specifically raised in its statement of the issues, Walmart argues that the AJ erred in accepting the claimant's alleged diminished wages because "no reliable information" was provided regarding her employment at Lowe's. Yet, "[t]he commission[,] within legal limits, is the sole judge of the weight and sufficiency of the evidence." *Morris v. Lansdell's Frame Co.*, 547 So. 2d 782, 785 (Miss. 1989). Furthermore, "[e]vidence which is not contradicted by positive testimony or circumstances, and which is not inherently improbable . . . is to be taken as conclusive and binding on the triers of facts." *Id*. Cauley testified that she earned $13.98 per hour working 39 hours per week at Lowe's, and there was no evidence to contradict her testimony.

**was adequate.**

¶88. Walmart argues that the AJ and the Commission erred in finding that the claimant's job search was adequate and not a "mere sham."

¶89. In order to establish a prima facie case of permanent disability for a body-as-a-whole injury, a claimant must make reasonable efforts to obtain the same or similar employment. *Lott v. Hudspeth Ctr.*, 26 So. 3d 1044, 1050 (¶19) (Miss. 2010). The determination of reasonableness of a claimant's job search is a fact-finding process. *Lifestyle Furnishings v. Tollison*, 985 So. 2d 352, 360 (¶25) (Miss. Ct. App. 2008).

¶90. What constitutes "reasonable" varies by situation and depends on a number of factors. *Thompson v. Wells–Lamont Corp.*, 362 So. 2d 638, 641 (Miss. 1978). The relevant factors are "job availability, economics of the community, the claimant's skills and background, and the nature of the disability." *Lott*, 26 So. 3d at 1049 (¶15).

¶91. Once a claimant establishes a prima facie case of disability, the employer may refute the claimant's case by showing that suitable employment was available and "that the claimant's efforts to obtain other employment were a mere sham, or less than reasonable, or without proper diligence." *Thompson*, 362 So. 2d at 641.

¶92. When Cauley was placed on inactive status and lost her job as assistant manager, she requested to be reinstated to that position. When that effort was unsuccessful, she searched Walmart's online portal numerous times to find either a lower-level position at the Laurel store or any position at another location. She also reached out to colleagues at other Walmart stores to inquire about openings. Testimony from the HR manager revealed Cauley was "a

26

solid performer" at work, and Martinez stated she "would have been a good candidate" in the application process. Despite this, Cauley was unable to obtain a job at Walmart.

¶93. Effectively locked out of Walmart's system, Cauley expanded her search and applied for at least 14 various positions in a relatively wide geographic area. While testimony and medical records indicate driving hurt her back, Cauley was willing to take jobs in towns more than thirty minutes away, like Hattiesburg. She was also willing to take a lower-level, lower-paying job. In addition to posting her resume online and filing applications, Cauley personally reached out to businesses in the area to ask if they were hiring. She ultimately got a job at Lowe's through her online post.

¶94. Cauley's resume shows she has experience in retail sales, sewing, and decorating, and her reported job applications reflect her effort to obtain employment relating to those skills and experience. For example, she applied for positions at Jo-Ann's Craft and Fabric store, Lowe's, Michael's, Kirkland's, and other retail stores.

¶95. Walmart dismisses Cauley's job search by claiming that she refused to apply for available assistant manager positions at Walmart. In its brief, Walmart claims such positions were available but that Cauley "flat out refused" to apply for them. However, Cauley repeatedly testified she never found any assistant manager positions on the Wire or by contacting colleagues at nearby stores. She testified that she applied for the only management position available to her, but she was not hired.

¶96. Nevertheless, the relevant test is not whether Cauley applied to positions within Walmart. Rather, it is whether she made reasonable efforts to find "the same or other

27

employment." Miss. Code Ann. § 71-3-3(i). Cauley did both. She asked to be reinstated in her assistant manager position and tried multiple ways to find any available jobs at other Walmart locations. When that effort proved unsuccessful, she expanded her search to a range of jobs in her community and surrounding areas. She applied for jobs relevant to her skill set, as well as lower-level, hourly jobs. In the end, Cauley took an hourly cashier job at Lowe's earning significantly less than her salaried position at Walmart.

¶97. Tellingly, Cauley testified that if any other position had been available to her at Walmart, she would have accepted it. Yet Martinez explained that Walmart would not hire her for lower positions at the Laurel store because she had been an assistant manager there and because it was a training facility. She was also ineligible for hire at the Laurel Walmart due to her inactive status. She had to request an exception to apply for positions at other locations, but every time she checked the online portal, none were available.

¶98. Walmart also argues that Cauley failed to establish that her injury was a contributing reason for her unsuccessful job search under *Georgia Pacific Corporation v. Taplin*, 586 So. 2d 823 (Miss. 1991). However, the *Taplin* Court held "a finding of lost wage-earning capacity [is supported] if a claimant cannot perform the jobs he once could." *Id*. at 828. The Court explained, "It is enough that . . . the claimant did sustain an injury leading to a disability which has diminished his wage-earning capacity, and that he has reasonably attempted to find employment." *Id*. at 829. Therefore, Cauley did not have a burden to prove that she was denied employment by prospective employers because of her injury. Rather, it is sufficient that she suffered an injury and that injury resulted in a loss of wage-earning

28

capacity.

¶99.　Given the application of the relevant factors and Walmart's failure to refute the claimant's showing of a reasonable job search, we find that substantial evidence supported the AJ's decision that Cauley's job search was adequate and not a "mere sham."

## CONCLUSION

¶100.　The AJ's findings with regard to loss of wage-earning capacity were supported by substantial evidence.　Further, substantial evidence supported the finding that Cauley's job search was adequate and not a "mere sham."　We therefore affirm the decision of the AJ and the Commission.

¶101.　**AFFIRMED.**

　　　**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. GREENLEE, J., NOT PARTICIPATING.**